# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DIANA R. SMITH,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:14cv00042** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | **BY: PAMELA MEADE SARGENT** |
| **Defendant** | ) | **United States Magistrate Judge** |

*I. Background and Standard of Review*

Plaintiff, Diana R. Smith, ("Smith"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Smith protectively filed an application for DIB on February 24, 2011, alleging disability as of October 1, 2009, due to scoliosis, degenerative disc disease, cervical degenerative disc disease, cervical spondylosis, bulging disc, pain in her neck, back, ribs, groin and leg, depression and fibromyalgia. (Record, ("R."), at 28, 152-53, 173, 176.) The claim was denied initially and on reconsideration. (R. at 71-73, 76, 78-80.) Smith then requested a hearing before an administrative law judge, ("ALJ"). (R. at 83.) A hearing was held on June 18, 2013, at which Smith was represented by counsel. (R. at 24-47.)

By decision dated July 3, 2013, the ALJ denied Smith's claim. (R. at 10-18.) The ALJ found that Smith met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2011. (R. at 12.) The ALJ also found that Smith had not engaged in substantial gainful activity since October 1, 2009, her alleged onset date.[1] (R. at 12.) The ALJ found that the medical evidence established that Smith suffered from severe impairments, namely degenerative

---

[1] Therefore, Smith must show that she became disabled between October 1, 2009, the alleged onset date, and March 31, 2011, the date last insured, in order to be entitled to DIB benefits.

Case 2:14-cv-00042-PMS   Document 15   Filed 11/24/15   Page 2 of 21   Pageid#: 682

disease of the cervical and lumbar spines and fibromyalgia, but she found that Smith did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12-14.) The ALJ found that Smith had the residual functional capacity to perform light work,[2] which did not require more than frequent balancing and overhead reaching; that did not require more than occasional climbing of ramps and stairs, stooping, kneeling, crouching and crawling; and that did not expose her to hazardous machinery, vibrating surfaces, unprotected heights and climbing ladders, ropes and scaffolds. (R. at 14.) The ALJ found that Smith was able to perform her past relevant work as a teacher and a government eligibility worker. (R. at 16.) Based on Smith's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Smith could perform, including jobs as an order filler, a marker/merchandise marker[3] and a cashier. (R. at 17.) Thus, the ALJ found that Smith was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 18.) *See* 20 C.F.R. § 404.1520(f), (g) (2015).

After the ALJ issued her decision, Smith pursued her administrative appeals,

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

[3] The ALJ refers to the job as a "marker/merchant." (R. at 17.) However, the Dictionary of Occupational Titles, ("DOT"), cited in the ALJ's opinion matches that given by the vocational expert for a "marker" or "merchandise marker." (R. at 45.) A check of the DOT confirms that the code cited corresponds to the job of a marker or merchandise marker. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, Marker, Occupational Code 209.587-034 (4th ed. rev. 1991).

-3-

but the Appeals Council denied her request for review. (R. at 1-5.) Smith then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Smith's motion for summary judgment filed June 5, 2015, and the Commissioner's motion for summary judgment filed August 6, 2015.

## II. Facts

Smith was born in 1969, (R. at 29, 152), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a Bachelor of Science degree in business technology and education. (R. at 28-29.) Smith testified at her hearing that she was then-currently listed as adjunct faculty at a local community college. (R. at 29.) She stated that she had not recently taught a class because there had been no enrollment for the class that she taught. (R. at 29.) She has past relevant work as a high school business teacher, an eligibility worker for the Department of Social Services and as a general education development, ("GED"), teacher. (R. at 30.) Smith stated that she could stand 10 to 15 minutes without interruption and sit for 20 minutes without interruption. (R. at 32.) She stated that she could lift items weighing up to 10 pounds. (R. 32-33.)

Mark Hileman, a vocational expert, also was present and testified at Smith's hearing. (R. at 42-46.) Hileman classified Smith's past work as a high school teacher and a GED teacher as light and skilled and her work as a government

eligibility worker as sedentary[4] and skilled. (R. at 43.) Hileman was asked to consider a hypothetical individual of Smith's age, education and work history, who had the residual functional capacity to perform light work that did not require more than frequent balancing and reaching overhead; that did not require more than occasional climbing of ramps and stairs, stooping, kneeling, crouching and crawling; that did not require concentrated exposure to hazardous machinery, unprotected heights, climbing ladders, ropes and scaffolds or working on vibrating surfaces. (R. at 44.) Hileman stated that such an individual could perform all of Smith's past work, in addition to other jobs that existed in significant numbers, including jobs as an order filler, a marker or merchandise marker and a cashier II. (R. at 44-45.) With respect to the merchandise marker and the cashier II jobs, Hileman was asked to consider the same hypothetical individual, but who would be limited to repetitive, unskilled work that did not require more than an ability to understand, remember and carry out simple instructions. (R. at 45.) Hileman stated that the jobs of merchandise marker and cashier II would not be affected. (R. at 45.) When asked if the individual described in the first hypothetical would be off-task for up to 20 percent of any workday, Hileman stated that there would be no jobs available that such an individual could perform. (R. at 45-46.)

In rendering her decision, the ALJ reviewed medical records from Julie Jennings, Ph.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a) (2015).

-5-

agency physician; Dr. J. Astruc, M.D., a state agency physician; Norton Community Hospital; East Tennessee Brain & Spine Center; Dr. Richard W. Duncan, M.D.; Highlands Chiropractic & Wellness Clinic; Vada Rose, F.N.P., a family nurse practitioner; Dr. Matthew W. Cusano, M.D.; Dominion Health & Fitness; Mountain States Rehabilitation; Pain Medicine Associates; Dr. Ken W. Smith, M.D.; C. Marcus Cooper, Ph.D., a psychologist; and Dr. Christopher Morris, M.D.

On July 26, 2010, Smith saw Vada Rose, F.N.P., and Dr. Matthew W. Cusano, M.D., for complaints of back spasms. (R. at 321.) She stated that she had been babysitting a 14-month-old child who did not like to be put down, so she carried him around a lot on her left hip. (R. at 321.) Smith stated that she now had left-sided back pain. (R. at 321.) She reported that she took Motrin for the pain with some relief. (R. at 321.) An MRI of Smith's cervical spine taken on August 27, 2010, showed a small disc osteophyte complex at the C4-C5 disc space causing right greater than left mild neuroforaminal narrowing; a disc osteophyte complex at the C5-C6 disc space with mild to moderate bilateral neuroforaminal narrowing; and a very small disc osteophyte complex at the C6-C7 disc space with no significant stenosis. (R. at 252, 301.) An MRI of Smith's thoracic spine showed no significant degeneration or herniation. (R. at 252, 254, 304.) An MRI of Smith's lumbar spine showed a mild broad-based disc bulge at the L3-L4, L4-L5 and L5-S1 levels. (R. at 252, 255, 303.) A CT scan of Smith's abdomen and pelvis showed no evidence of compression deformity. (R. at 305.) On September 10, 2010, Smith complained of thoracic pain. (R. at 318.) Smith stated that the pain was worse with

-6-

activity and relieved with rest. (R. at 318.) Smith reported that she occasionally took Motrin for pain. (R. at 318.)

On February 11, 2011, Smith complained of back pain. (R. at 315-16.) Smith had reduced range of motion in her back. (R. at 316.) She was diagnosed with multiple joint pain. (R. at 316.) On February 13, 2011, a bone mineral density study was normal. (R. at 432.) On June 30, 2011, Smith complained of neck pain, thoracic pain, low back pain and weakness. (R. at 517.) Rose and Dr. Cusano noted that Smith was "weepy." (R. at 517.) Smith stated that she was depressed, but not depressed enough to take any medication. (R. at 517.) Smith reported that she only took Tylenol for her back pain and that she preferred to keep it that way. (R. at 517.) Smith was diagnosed with fatigue, muscle weakness, thoracic pain, lumbosacral pain and depression. (R. at 517.) On July 11, 2011, an MRI of Smith's lumbar spine showed a mild broad-based disc bulge without evidence of significant neuroforaminal narrowing at the L4-L5 level. (R. at 421.) An MRI of Smith's thoracic spine showed possible Schmorl's node[5] at the T2 level, a mild nonspecific heterogeneous marrow signal and mild spur formation. (R. at 422.) On April 13, 2011, an ultrasound of Smith's abdomen was unremarkable. (R. at 429.)

By letter dated March 20, 2012, Rose stated that Smith would be unable to work due to severe back pain. (R. at 511.) She stated that she had been treating Smith since July 26, 2010, and that Smith had been compliant with treatment, but

---

[5] Schmorl's node is a nodule of the spine due to prolapse of a nucleus pulposus into an adjoining vertebra. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's), 1143 (27th ed. 1998).

with little response. (R. at 511.) Rose stated that Smith was unable to sit, stand or walk for long periods of time. (R. at 511.) Rose stated that Smith was unable to consistently work four hours a day and that she would be unable to move machinery, to reach or to push or pull any type of equipment. (R. at 511.) She also stated that Smith would be absent from work more than she would be present at work. (R. at 511.) On April 23, 2012, Smith complained of worsening neck and thoracic pain. (R. at 604.) Smith had neck pain with flexion, extension and rotation and no restriction or reduction with range of motion. (R. at 604.) Smith had no edema of the lower extremities. (R. at 604.) On February 11, 2013, Rose reported that Smith had a normal gait. (R. at 579.) Smith's affect and mood were normal. (R. at 579.) On April 16, 2013, Smith complained of arthralgias, joint pain, back pain and joint stiffness. (R. at 573-77.) Smith denied anxiety, depression or emotional problems. (R. at 573.) Rose reported that Smith's affect and mood were normal. (R. at 575.) Rose reported that Smith had normal flexion, extension and rotation of the lumbosacral spine. (R. at 575.)

On October 29, 2010, Smith saw James J. Casey, PA-C, a certified physician's assistant at East Tennessee Brain & Spine Center, for complaints of chronic cervical, thoracic and lumbar pain. (R. at 250-53.) Smith stated that she took ibuprofen and Tylenol for pain. (R. at 250.) Smith's psychiatric examination was normal. (R. at 251.) She had a normal gait, muscle strength and full range of motion of her neck. (R. at 251-52.) Casey reported that Smith had no impairment of recent or remote memory, and she had normal attention span and concentration. (R. at 251-52.) Examination of Smith's cervical, thoracic and lumbar spines

-8-

revealed no tenderness to palpation, no pain, no muscle spasms and normal spine movement. (R. at 252.) Casey diagnosed cervical degenerative disc disease; cervical spondylosis without myelopathy; neck pain; thoracic spine pain; and low back pain. (R. at 252.)

On January 14, 2011, Dr. Richard W. Duncan, M.D., saw Smith for her complaints of neck, mid-back and low back pain. (R. at 264-66.) Smith's examination was normal with the exception of some tenderness in the lower lumbar spine. (R. at 265.) MRI scans of Smith's thoracic spine and cervical spine showed mild degenerative changes, consistent with someone of Smith's age. (R. at 265.) Dr. Duncan diagnosed chronic, multilevel degenerative disc disease of the lumbar spine with back pain, cervical spondylosis without myelopathy and thoracic mild degeneration with pain. (R. at 265.) Dr. Duncan encouraged Smith to perform regular core strengthening exercises, and he prescribed Mobic to take as needed. (R. at 265.) He noted that there was nothing more to offer Smith from an orthopedic spinal surgery perspective. (R. at 265.)

On July 19, 2011, Dr. Michael Hartman, M.D., a state agency physician, opined that Smith had the residual functional capacity to perform light work. (R. at 54-56.) He noted that Smith could frequently climb ramps and stairs and balance and occasionally stoop, kneel, crouch, crawl and climb ladders, ropes and scaffolds. (R. at 54-55.) No manipulative, visual or communicative limitations were noted. (R. at 55.) Dr. Hartman found that Smith should avoid concentrated exposure to extreme cold, wetness, vibration and hazards. (R. at 55.)

-9-

On July 28, 2011, Smith saw Dr. Ken W. Smith, M.D., at the Blue Ridge Neuroscience Center, P.C., for complaints of lumbar pain and bilateral lower extremity pain. (R. at 452-55.) Smith reported that she used Advil, Tylenol and Tylenol Extra Strength for pain. (R. at 452.) Dr. Smith noted that Smith was in no acute distress. (R. at 453.) Examination revealed kyphosis of the thoracic spine and tenderness of the thoracic and lumbar spine. (R. at 453.) No misalignment, asymmetry, crepitation, tenderness, masses, deformities or effusions were noted in the bilateral upper and lower extremities. (R. at 453.) Smith had limited range of motion of the spine, ribs and pelvis. (R. at 453.) She had no limitation of range of motion of the head, neck and bilateral upper and lower extremities. (R. at 453.) Smith had a normal gait, strength and tone, and no atrophy was noted. (R. at 453-54.) Dr. Smith reported that Smith's mood and affect were appropriate. (R. at 454.) Dr. Smith diagnosed thoracic pain, lumbar degenerative disc disease and low back pain. (R. at 454.) He noted that Smith could continue her employment and activities as a teacher. (R. at 454.)

On August 24, 2011, Smith was discharged from Dominion Health & Fitness after participating in nine physical therapy sessions. (R. at 350-65.) It was noted that Smith made progress toward range of motion and strengthening goals and that she responded well to modalities with temporary decrease in pain symptoms post treatment. (R. at 351.) Smith was discharged pursuant to her request. (R. at 351.)

On August 25, 2011, Smith was seen at Pain Medicine Associates, P.C.,

-10-

("Pain Medicine Associates"), with complaints of intermittent low back pain with radiation of pain into her groin and thighs without weakness or numbness, as well as mid back pain. (R. at 383-84.) Examination of her cervical and thoracic spines revealed normal curvature and full range of motion. (R. at 383.) Examination of Smith's lumbar spine revealed increased pain with extension or flexion and tenderness of the lumbar paraspinals. (R. at 383.) Straight leg raising tests were negative bilaterally. (R. at 383.) Examination of Smith's upper and lower extremities was normal, and she had normal motor strength. (R. at 384.) Benjamin A. Meeks, F.N.P., reported that Smith's mood was euthymic with a congruent affect. (R. at 384.) Smith's thoughts were logical, and her rate of speech, tone of voice and eye contact were all appropriate. (R. at 384.) On October 20, 2011, Smith reported that her pain was somewhat better with the Transcutaneous Electrical Nerve Stimulation, ("TENS"), unit and physical therapy. (R. at 382.) She stated that the Flector Patch[6] was helpful without significant side effects. (R. at 382.) Meeks reported that Smith's gait was somewhat antalgic and steady without assistive devices. (R. at 382.) He diagnosed lumbar degenerative disc disease at the L4-L5 level. (R. at 382.)

On December 1, 2011, Dr. W. Turney Williams, M.D., a physician with Pain Medicine Associates, saw Smith for complaints of low back pain, bilateral groin

---

[6] Flector Patch is the only prescription nonsteroidal anti-inflammatory patch used for acute pain due to minor strains, sprains or bruises. *See* http://www.flectorpatch.com/about (last visited Nov. 20, 2015).

-11-

pain and various extremity complaints.[7] (R. at 472.) Dr. Williams reported that Smith's upper extremity sensory and motor function were intact. (R. at 472.) She had mild tenderness in her forearms, arms and anterior chest wall. (R. at 472.) Straight leg raising tests were negative. (R. at 472.) Dr. Williams reported that Smith's lower extremity sensory and motor functions were intact. (R. at 472.) She had mild tenderness in her anterior thigh, as well as cervical and thoracic myofascial tenderness. (R. at 472.) Dr. Williams diagnosed lumbar spondylosis; minimal degenerative disc disease at the L4-L5 level; diffuse pain-related complaints, likely fibromyalgia variant; and probable mild depression. (R. at 472.) Dr. Williams referred Smith for a psychological assessment. (R. at 472.) On October 17, 2012, Smith reported persistent pain, but stated that it was gradually getting better with the lifestyle changes that she was making through counseling. (R. at 548.) She stated that the use of Valium improved her sleep and function and decreased her pain. (R. at 548.)

On January 19, 2012, Dr. J. Astruc, M.D., a state agency physician, opined that Smith had the residual functional capacity to perform light work. (R. at 66-68.) He noted that Smith could frequently climb ramps and stairs and balance and occasionally stoop, kneel, crouch, crawl and climb ladders, ropes and scaffolds. (R. at 67.) No manipulative, visual or communicative limitations were noted. (R. at 67.) Dr. Astruc found that Smith should avoid concentrated exposure to extreme cold, wetness, vibration and hazards. (R. at 68.)

---

[7] On November 10, 2011, Dr. Williams administered an epidural steroid injection. (R. at 472-74.) Smith noted an increase in back pain following the injection, but subsequent resolution of her low back pain. (R. at 472.)

-12-

On December 1, 2011, C. Marcus Cooper, Ph.D., a psychologist, evaluated Smith upon referral from Dr. Williams. (R. at 557-58.) Smith reported widespread pain throughout her entire body, muscle spasms and chronic fatigue. (R. at 557.) Cooper noted no significant problems with memory, concentration or judgment. (R. at 557.) Smith reported that she did not "feel all that depressed," but Cooper reported that this was inconsistent with psychological testing. (R. at 557.) The Pain Patient Profile showed that Smith's depression was clearly a component of her overall pain and symptomatology. (R. at 558.) Cooper diagnosed mood disorder due to general medical condition; insomnia due to general medical condition; fibromyalgia; chronic fatigue; and lumbar degenerative disc disease. (R. at 558.) On March 7, 2012, Smith complained of muscle and joint pain and fatigue. (R. at 555.) Cooper encouraged her to start an exercise program. (R. at 555.) Cooper diagnosed fibromyalgia; chronic fatigue; multiple joint pain; chronic constipation; and insomnia. (R. at 555.) On April 5, 2012, Smith complained of widespread pain, with the worst pain being in her mid back, groin and abductors of the legs. (R. at 554.) Smith rated her pain level as a two on a scale of zero to 10. (R. at 554.) She reported that she started an exercise program with a stationary bicycle and a walking program. (R. at 554.) On May 31, 2012, Smith reported groin pain following walking or exercising. (R. at 553.) She reported that her sleep had improved. (R. at 553.) On August 20, 2012, Smith reported her pain level as a two on a scale of zero to 10. (R. at 552.) She continued to complain of sleep issues. (R. at 552.) On October 17, 2012, Dr. Williams noted that Smith was doing "quite well" and was pleased with the progress that she had made. (R. at 551.)

-13-

On May 14, 2013, Dr. Christopher Morris, M.D., saw Smith for her back pain. (R. at 606-08.) Dr. Morris noted that Smith had full range of motion in her upper extremities, without synovitis, swelling or tenderness. (R. at 607.) Smith had no metatarsalphalangeal joint synovitis, and her ankles were without edema or tenderness. (R. at 607.) Smith had good rotation of her hips with mild lateral thigh tenderness. (R. at 607.) Dr. Morris noted that Smith had some discomfort on palpation over the sacroiliac joints in her back. (R. at 607.) Smith's deep tendon reflexes were intact. (R. at 607.) Dr. Morris diagnosed fibromyalgia syndrome; myalgias; back disorder, unspecified; and hypermobility syndrome. (R. at 608.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.

-14-

The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if she sufficiently explains her rationale and if the record supports her findings.

Smith argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-7.) Smith also argues that the ALJ erred by failing to give appropriate credence to her testimony. (Plaintiff's Brief at 7-8.) Smith further argues that the ALJ failed to properly assess the effect of pain and fatigue on her alleged ability to perform substantial gainful activity. (Plaintiff's

-15-

Brief at 7-8.)

Smith argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Brief at 6-7.) Smith must show that she became disabled between October 1, 2009, the alleged onset date, and March 31, 2011, the date last insured, in order to be entitled to DIB benefits. The ALJ found that Smith had the residual functional capacity to perform a limited range of light work. (R. at 14.) Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding with regard to Smith's residual functional capacity.

With respect to Smith's fibromyalgia, the ALJ observed that Smith did not receive a positive diagnosis of a "possible fibromyalgia variant" until December 2011, more than eight months past her date last insured. (R. at 15, 472, 506.) Although there is no medical listing for fibromyalgia, Titles II and XVI of Social Security Ruling 12-2p provides guidance on how the Commissioner develops evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how to evaluate fibromyalgia in disability claims and continuing disability reviews. *See* S.S.R. 12-2(p), WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013); *see also* 2012 WL 3104869 (July 25, 2012).

According to S.S.R. 12-2p, as with any other disability claim, objective medical evidence is needed to establish that a person's fibromyalgia constitutes a medically determinable impairment. *See* S.S.R. 12-2p. Here, Smith does not allege that the ALJ failed to find that her fibromyalgia constituted a medically

-16-

determinable impairment. In fact, not only did the ALJ find that it constituted a medically determinable impairment, but she also found that it was severe. (R. at 12.) Pursuant to S.S.R. 12-2p, once a medically determinable impairment of fibromyalgia is established, it will be considered in the five-step sequential evaluation process to determine whether it is disabling. *See* S.S.R. 12-2p. At step three of this process, it must be determined whether the individual's impairments meet or equal the criteria of any of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* S.S.R. 12-2p. Social Security Ruling 12-2p makes clear that fibromyalgia itself cannot meet a listing because it is not a listed impairment. *See* S.S.R. 12-2p. Therefore, it must be determined whether an individual's fibromyalgia medically equals a listing or whether it medically equals a listing in combination with at least one other medically determinable impairment. *See* S.S.R. 12.2p.

Here, the ALJ specifically found that Smith's impairments did not equal the criteria for any of the listings for musculoskeletal impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.01 *et seq*. (R. at 14.) The ALJ, in her decision, stated that Smith did not exhibit the signs, symptoms or laboratory findings outlined in those listings. (R. at 14.) When an individual's impairments do not meet or equal a listing, a residual functional capacity determination must be made. *See* S.S.R. 12.2p. For an individual with fibromyalgia, the longitudinal record will be considered whenever possible because the symptoms of fibromyalgia can wax and wane so that a person may have "bad days and good days." S.S.R. 12-2p. At steps four and five, an individual's residual functional

-17-

capacity is used to determine whether she is able to perform any past relevant work or any other work existing in significant numbers in the national economy. *See* S.S.R. 12-2p.

As stated above, Smith does not challenge the ALJ's findings regarding steps one through three. Smith argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Brief at 6-7.) The ALJ concluded that Smith could perform a range of light work, as set out herein. For the following reasons, I find that this residual functional capacity determination is supported by substantial evidence.

The ALJ noted that diagnostic evidence was relatively benign, observing that MRIs taken in September 2010 revealed only mild to moderate foraminal narrowing in the cervical spine and mild disc bulges in the lumbar spine. (R. at 14-15, 254-56.) In addition, Dr. Duncan found that any degeneration of the spine shown by the MRIs was consistent with expected degeneration for age, concluding that nothing "dangerous or bad" was occurring and that surgery was not warranted. (R. at 264-65.) Dr. Williams also reviewed Smith's MRIs in November 2011, similarly concluding that any degeneration was "extremely mild" and "close to within normal limits for age." (R. at 461.)

The ALJ also found that Smith's course of treatment was conservative, and her doctors consistently documented her strength and range of motion metrics to be within normal ranges. (R. at 15-16.) In October 2010 and January 2011, Smith's

-18-

doctors found that she had full range of motion, a normal gait, normal muscle strength and tone and normal coordination. (R. at 251-52, 264-65.) While Smith was found to have some reduced trunk range of motion in February 2011, a subsequent report from her physical therapists in August 2011 show that any remaining range of motion deficits were effectively remedied through treatment. (R. at 350-51.) Smith had nearly full strength in all areas, and her ability to sit, stand and walk was only mildly limited. (R. at 350-51.) The ALJ also noted that conservative treatment was typical for Smith. (R. at 16.) In January 2011, Dr. Duncan recommended core exercises. (R. at 265.) In February 2011, Smith reported that she did not want to take any medications other than Motrin. (R. at 313.) Chiropractic treatment from February to April 2011 helped alleviate Smith's symptoms. (R. at 273-75.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Furthermore, Smith conceded at her hearing that her symptoms were not as limiting in July 2011 as they were at the time of her hearing. (R. at 39.) Two weeks before Smith's date last insured, she reported that she was experiencing only minimal pain in her lower back and mild pain in other areas. (R. at 274-75.) A psychiatric examination in 2010 was normal, including normal memory, attention and concentration. (R. at 251-52.) In December 2011, it was noted that Smith had no significant problems with memory, concentration or judgment. (R. at 557.)

Additionally, I find unpersuasive Smith's argument that the March 2012 letter from her treating nurse practitioner, Rose, should have been given more

-19-

weight in determining her residual functional capacity and ultimate disability. First, Rose's letter was written approximately one year following the expiration of Smith's date last insured. Next, Rose's treatment notes of Smith are inconsistent with the restrictive findings set forth in the March 2012 letter. For instance, Rose concluded that Smith could not sit, stand or walk for long periods of time due to severe back pain radiating into both legs. She further concluded that Smith could not work and would be absent more days than she would be present. However, in her treatment notes of Smith, Rose noted multiple diagnostic imaging results that were relatively benign in nature, and Smith was treated conservatively with only over-the-counter medications. Lastly, the court notes that the determination of both a claimant's residual functional capacity and the ultimate determination of disability rest with the ALJ. *See* 20 C.F.R. §§ 404.1527, 404.1546 (2015). Thus, Rose's letter containing these opinions is not entitled to any greater weight simply because she is Smith's treating medical source,

Smith next argues that the ALJ erred in finding that her statements were not entirely credible. (Plaintiff's Brief at 7-8.) I find that the ALJ reasonably found that Smith's subjective complaints of disabling functional limitations were not credible. When an ALJ finds there is a medically determinable impairment that could reasonably be expected to produce a claimant's alleged complaints, she must evaluate the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities. *See* 20 C.F.R. § 404.1529(c)(1) (2015). Evidence considered at this stage includes a claimant's subjective complaints, medical evidence, other relevant evidence in the record, and

-20-

inconsistencies in the evidence or conflicts between the claimant's statements and the rest of the evidence. *See* 20 C.F.R. §§ 404.1529(a), (c)(1), (4) (2015). The ALJ need not accept as credible a claimant's statements regarding the severity, persistence or disabling effects of her symptoms where the ALJ finds that those statements are inconsistent with other evidence of record. *See Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996). The ALJ concluded that Smith's allegations of total disability were not entirely credible because the record evidence did not support a finding that Smith was completely disabled during the relevant period. (R. at 14-15.) Smith's lumbar and cervical spine exhibited only mild degenerative changes consistent with age, (R. at 264-65, 461), her strength and range of motion were minimally impaired, (R. at 251-52, 264-65), and her activities of daily living were not consistent with severely disabling pain. (R. at 200-01.) In fact, Smith consistently reported that she took only Motrin and Tylenol for pain. (R. at 250, 318, 321, 452, 517.) Based on this, I also find that the ALJ properly analyzed Smith's allegations of pain.

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's finding with regard to Smith's residual functional capacity and her finding that Smith was not disabled. An appropriate Order and Judgment will be entered.

ENTERED: November 24, 2015.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-21-